Argued and submitted February 19, affirmed April 16, 1997

## MARQUAM FARMS CORPORATION,
### *Respondent,*

*v.*

## MULTNOMAH COUNTY,
### Tim Schillereff and Angela Schillereff,
### *Petitioners.*

## (LUBA No. 95-254; CA A95801)

936 P2d 990

Edward J. Sullivan argued the cause for petitioners. With him on the brief were Sandra N. Duffy, Chief Deputy County Counsel for Multnomah County, Daniel Kearns and Preston Gates and Ellis.

Lawrence R. Derr argued the cause for respondent. With him on the brief was Josselson, Potter & Roberts.

Before Deits, Presiding Judge, and De Muniz and Haselton, Judges.

DEITS, P. J.

**DEITS, P. J.**

In 1995, petitioners Schillereff applied to petitioner Multnomah County for "conditional use approval, or, alternatively, an alteration of a non-conforming use," to allow the Schillereffs to enlarge a kennel use on high-value farmland in an exclusive farm use (EFU) zone. The applicants sought to increase the use from its ostensible existing level of 50 dogs to 75.[1] The county treated the filing as three separate applications, respectively for (1) an "initial" (*i.e.*, new) conditional use permit, (2) an expansion of an existing conditional use, and (3) an expansion of a nonconforming use. The county hearings officer approved all three variations, and, on respondent's appeal, the county governing body effectively adopted the hearings officer's opinion and approved the expanded use. Respondent appealed to LUBA. LUBA disagreed with the county's disposition of each application and remanded the decision to the county. Petitioners seek review, and we affirm.

The applicants acquired the affected property and began operating a commercial kennel on it in 1989. Their various predecessors had at times operated a commercial kennel on the property and, apparently, were doing so in the mid-1950s, when the county enacted zoning legislation disallowing the kennel use. Thereafter, the continuity and exact extent of the use varied considerably, as the property was transferred among the various owners. As LUBA explained, the "parties appear to agree that prior to 1989 there had not been a commercial kennel on the property for at least 15 to 20 years." However, under relevant county legislation, a facility with as few as four adult dogs is defined as a "kennel"; hence, the county's designation could apply to kennel uses that, depending on the specific nature of the use, could fall well short of commercial or other quantitative levels that might nevertheless be relevant to the determination of the nature and extent of the use.

---

[1] The Schillereffs and the county have appeared jointly in this court. In the balance of this opinion, we will refer to them jointly, in their capacity as parties, as "petitioners." Where differentiation is necessary, we will call them the "applicants" and the "county," respectively.

The evidence here was in conflict as to how many dogs occupied the property at various times between the enactment of restrictive zoning and the present. There was some evidence that only the owner's own dog or dogs inhabited the facility at some times, and there was even evidence that periods elapsed when no kennel activity was occurring on the property. However, the applicants presented evidence to the effect that there was a minimum of at least four dogs on the property at all relevant times. The county found that "some degree of kennel operations has persisted unabated from 1952 forward." However, it made no findings concerning the level of kennel activity at the time that the restrictive legislation became effective or at any subsequent time.

In 1977, the county enacted what is now Multnomah County Code (MCC) 11.15.2028(B) (section 2028(B)). As amended in 1980, it provides:

> "Conditional uses listed in subpart MCC.2012 legally established prior to August 14, 1980, shall be deemed conforming and not subject to the provision of MCC.880[5], provided however, that any change of use shall be subject to approval pursuant to the provisions of MCC.2012."

Section .2012 of the code contains a list of uses that "may be permitted when approved by the [county] pursuant to the county conditional use procedures." Kennel uses were added to that list in 1986. Section .8805 prohibits the resumption of a nonconforming use that has been discontinued or abandoned for a two-year period, unless the use meets applicable code requirements at the time of its proposed resumption.

In 1990, the applicants sought design review approval from the county for "remodeling a kennel for 50 dogs" and also sought a conditional use permit for a watchman's residence. Both applications were approved by the planning commission, and neither decision was appealed.[2] In

---

[2] The applicants attempted to apply for a conditional use permit in conjunction with the kennel remodeling but were advised by county personnel, apparently on the basis of section 2028(B), that a conditional use permit was unnecessary. No argument based on estoppel, vested rights or related principles is made to us.

It is important to emphasize that the design review approval is not the equivalent of a conditional use permit, either in terms of the procedures or the substantive criteria that must be satisfied in order to obtain it. We also emphasize that the

1994, the applicants again sought a design review approval from the county, this time to increase the kennel from a 50-dog to a 75-dog capacity. As described by LUBA, the county hearings officer concluded in 1994 that, notwithstanding the 1990 decisions, he could not approve the applicants' request because the applicants could not demonstrate that the underlying 50-dog use was authorized either by a "valid conditional use permit" or as the product or byproduct of a "valid, nonconforming use [existing] in 1980, which could become a 'conforming conditional use' under [section 2028]." The hearings officer denied the 1994 application "without prejudice." His decision was not appealed.

The next year, the applicants tendered the present applications to the county. The county found that *some* kennel use had continued on the property from 1952 through the present and, therefore, the applicants had established the existence of a nonconforming use on which the requested expansion of a *commercial* use could be predicated. The county further determined that the applicants enjoyed a conditional use for the 50-dog kennel by virtue of section 2028(B), and therefore also qualified for the requested expansion, as an enlargement of an existing conditional use, on that basis. In so determining, the county hearings officer and, in turn, the governing body made the following interpretation of section 2028(B):

"I therefore conclude that the most probable and reasonable meaning to be accorded .2028(B) is this: It purports to apply to a use that, but for the absence of a conditional use permit, *would be* a true conditional use. The resulting use comprises a 'conforming' conditional use or what might be described as a '.2028(B)' use. Such a 'conforming' conditional use may be curtailed or discontinued and resumed in the same manner as a true conditional use, unburdened by notions of 'abandonment' or 'discontinuance' normally associated with *non*-conforming uses.

"That interpretation also resolves a profound dilemma for a use that had, for example, been a non-conforming use and later became a 'listed' conditional use. A pre-existing use

---

1990 design review concerned the augmentation of the kennel's *capacity to* 50 dogs; conversely, in the main, the present decisions involve applications to increase a *use from* 50 dogs to 75.

that suddenly becomes a 'listed' conditional use can scarcely be described as a 'nonconforming use.' * * * MCC 11.15.2028(B) renders that species of use a 'conforming' conditional use without the need to apply for a conditional use permit in order to maintain a use that, but for the absence of a permit, is *already* a conditional use.

"* * * * *

"MCC 11.15.0010's definition of 'non-conforming use,' for instance, describes a use 'which does *not* conform with the use regulations of the district in which it is located.' Obviously, a 'non-conforming use' that suddenly attains a new status as a 'listed' conditional use falls outside that definition. Even if the definition of 'non-conforming use' said '*did* not conform' instead of '*does* not conform,' it would defy logic or reason to describe a 'listed'-but-never-formally-approved conditional use as a 'nonconforming' use." (Emphasis in original.)

Finally, the county concluded that, independently of the preceding grounds for the *expansion* of an existing use, the applicants had "fulfilled all of the applicable conditional use criteria" in the county's land use legislation and qualified for an "*initial*" conditional use permit to operate a 75-dog facility.

Respondent appealed the county's decisions to LUBA, which rejected the county's analysis and conclusions concerning each of the alternative applications that it granted. With respect to the expansion of the putative nonconforming use, LUBA reasoned that the county had failed to make necessary findings regarding the initial scope of the use at the time that it became nonconforming and had also not adequately defined the extent of the nonconforming use that continued to exist thereafter. LUBA accepted the county's finding that there was *some* ongoing kennel use throughout the 40-year period as being supported by substantial evidence. However, it noted that the county

"apparently concluded, without analysis, that since [the applicants had] established the continued existence of a kennel, *i.e.*, at least 4 adult dogs on the property since the 1950's, they had somehow established a nonconforming use to operate and expand a 50-dog kennel. Such a conclusion is not legally justified." (Footnote omitted.)

*See* ORS 215.130(5), (9). Accordingly, LUBA remanded the nonconforming use expansion issue for further county findings and evaluation concerning the "level of intensity" of the use at the time it became nonconforming and at subsequent times to the present.

LUBA also concluded that the granting of the "initial" conditional use permit for a 75-dog facility was erroneous, because it was contrary to OAR 660-33-120 and OAR 660-33-130, the pertinent state administrative rules promulgated by the Land Conservation and Development Commission (LCDC). LUBA explained that kennels are expressly prohibited on high-value farmland by OAR 660-33-120. Although OAR 660-33-130(18) allows "[e]xisting facilities [to] be maintained, enhanced or expanded, subject to other requirements of law," LUBA reasoned that the *initial* permit was not for an *existing* use.

Next, LUBA turned to the county's conclusion that the application could be granted as an expansion of an existing conditional use established pursuant to section 2028(B). LUBA first rejected petitioners' arguments positing that the county's 1990 decisions had already resolved the pertinent issues. LUBA concluded that those decisions contained no interpretation of section 2028(B). LUBA then addressed petitioners' argument that they enjoyed the necessary underlying conditional use under the county's interpretation of section 2028(B) in the present decision, and that LUBA was required to defer to that interpretation by ORS 197.829 and *Clark v. Jackson County*, 313 Or 508, 836 P2d 710 (1992). After observing that it found the substance of the county's interpretation somewhat obscure, LUBA said:

> "With regard to the county's explicit interpretation in its 1995 decision, as we read the hearings officer's analysis, he concludes that a nonconforming use can become permitted outright as a 'conforming conditional use' if the use is listed in the county's code as being a conditional use. It is unclear to us whether the county's explicit interpretation of .2028 allows abandoned nonconforming uses to 'spring' back into existence as permitted uses when those uses are listed as conditional uses, or whether it interprets .2028 to permit only valid existing nonconforming uses to become 'conforming conditional uses.'

"* * * * *

"As we understand the narrowest interpretation of .2028(B) that the county could have made in this decision, kennels in existence in 1986 are legislatively established as permitted uses (conforming conditional uses) without a showing of compliance with the ORS 215.296 farm impact standards. Such a showing is required for dog kennels to be established as permitted uses under ORS 215.283(2). To the extent the interpretation also allows abandoned non-conforming uses to 'spring' back, the interpretation also violates OAR 660-33-120, which prohibits new kennels on high-value farm land." (Footnote omitted.)

Consequently, LUBA remanded the decision to the county for it "to interpret .2028 in a manner consistent with ORS 215.283 and OAR 660-33-120."

Petitioners seek our review and assign error to each of the bases for LUBA's remand. We first consider their contention that LUBA was incorrect in holding that state law precluded the granting of an "initial" conditional use permit, *i.e.*, one authorizing a 75-dog kennel as a "new" use, without reference to any underlying nonconforming use or permitted conditional use status under section 2028(B).[3]

Petitioners do not appear to dispute that, by their terms, OAR 660-33-120 and OAR 660-33-130 make it impermissible to establish new kennel uses on high-value farmland and allow counties to issue kennel-related permits only in connection with existing facilities. They contend, however, that the rules are contrary to ORS 215.283(2)(m), which allows counties to permit dog kennels in EFU zones, without specifying whether they are new uses or continuations, enlargements or changes of existing ones. Petitioners therefore reason that the rules are invalid and cannot be given effect here. They rely on *Lane County v. LCDC*, 138 Or App 635, 910 P2d 414, *on recons* 140 Or App 368, 914 P2d 1114, *rev allowed* 324 Or 305 (1996), where we invalidated parts of

---

[3] We understand the point of LUBA's holding, and the target of petitioners' argument, to be that the county's interpretation of its own conditional use legislation, under which it granted the initial permit, was inconsistent with the two state administrative rules, OAR 660-33-120 and OAR 660-33-130, and was therefore reversible under ORS 197.829(1)(d).

OAR 660-33-120 and OAR 660-33-130 as conflicting with ORS 215.213.

ORS 215.213 pertains to nonfarm and ancillary farm uses in EFU zones in the counties—Lane and Washington—that have adopted "marginal lands" provisions. ORS 215.283 applies to uses in counties, like the county here, that have not adopted marginal lands provisions. ORS 215.213 and ORS 215.283 are similar in many respects, but there are some distinct differences between the two. *See Nichols v. Clackamas County*, 146 Or App 25, 932 P2d 1185 (1997). In our opinion on reconsideration in *Lane County,* we emphasized that our holding there related only to the validity of the rules under ORS 215.213 and in the "marginal lands" counties that are subject to that statute. We expressly left open the question of whether the rules conflict with any other statute. 140 Or App at 370-71.

Petitioners' contention here is arguably similar to certain reasoning that led to the conclusion in *Lane County* that the rules are not consistent with ORS 215.213. *See* 138 Or App at 638 & n 2. However, petitioners' effort to transport that reasoning to ORS 215.283 does not succeed. Both ORS 215.213 and ORS 215.283 relate to permissible uses in EFU zones *generally*. Neither deals with uses on *high-value* farmland *specifically*. As we explained in *Lane County*, the promulgation of LCDC's original high-value farmland rules (the predecessors to those involved in this case) preceded the legislature's 1993 adoption of certain statutes that do relate specifically to uses on—and LCDC rules regulating uses on—high-value farmland. *Id.* at 638-39.

As we observed in *Lane County*, the 1993 statutes rejected some of the other agricultural land categories established by the LCDC rules, but the legislature "recognized * * * the high-value farmland category. ORS 215.304(1); ORS 215.710." *Id.* We emphasized in particular in *Lane County, id.,* that ORS 215.304(3), one of the 1993 statutes, precludes the implementation or enforcement of or the giving of legal effect to

"[a]ny portion of a rule inconsistent with the provisions of ORS 197.247 (1991 Edition), *215.213,* 215.214 (1991 Edition), 215.288 (1991 Edition), 215.317. 215.327 and 215.337

(1991 Edition) or 215.705 to 215.780 * * *." (Emphasis supplied.)

That critical point in our analysis in *Lane County* also constitutes the critical difference between *Lane County* and this case: ORS 215.304 expressly prohibits the implementation of LCDC high-value farmland rules insofar as they conflict with the general EFU use provisions of ORS *215.213*, but it contains no prohibition against the implementation of the rules insofar as they affect the operation of ORS *215.283* or the uses generally allowed by that statute.

That distinction made no difference in *Lane County*, because ORS 215.304, one of the high-value farmland provisions, *itself* requires the LCDC rules to be consistent with ORS 215.213. However, because ORS 215.304 does not require that the rules be consistent with ORS 215.283, the general statute involved here, the distinction *is* decisive in this case. Given that ORS 215.213 and ORS 215.283 are both concerned generally with permissible uses in EFU zones, the fact that ORS 215.304 expressly requires LCDC's high-value farmland rules to be consistent with ORS 215.213, but contains no requirement of consistency with ORS 215.283, clearly means that the legislature intended for the rules to operate independently of ORS 215.283 in counties where that statute rather than ORS 215.213 is applicable.

Our distinction between these statutes is not a word game, nor is there any likelihood that the difference in treatment is the result of a legislative omission. The state legislature may and has chosen to regulate uses on agricultural lands differently in marginal lands and nonmarginal lands counties. Indeed, that is the reason why the *largely* similar ORS 215.213 and ORS 215.283 *both* exist.[4]

---

[4] The legislature's intention that the high-value farmland rules be subordinated only to the preexisting statutes relating to marginal lands is further illustrated by the fact that the list of statutes in ORS 215.304(3) also includes *former* ORS 215.288, ORS 215.317 and ORS 215.327. Further, ORS 215.316 *et seq* establish a general pattern in which the regulation of marginal lands and high-value farmland are treated separately and differently.

The 1993 legislation eliminated the option for counties to adopt marginal lands provisions, but allowed counties that had already adopted such provisions to continue to apply them. ORS 215.316; *see Lane County*, 138 Or App at 639.

■    We hold that the limitations that OAR 660-33-120 and OAR 660-33-130 place on uses on high-value farmland are within LCDC's authority under ORS 215.304, and are not subject to and therefore cannot violate ORS 215.283(2).[5] It follows that LUBA did not err in remanding the county's approval of the "initial" conditional use permit, which purports to allow a new use that the rules prohibit.

We turn to petitioners' assignments that respectively challenge LUBA's remands of the county's allowance of the expansion of the nonconforming use and of the "section 2028(B) conditional use." Petitioners argue, correctly, that they were entitled to file three applications for the same use, as alternatives to one another that need not necessarily be consistent with each other. The initial problem with petitioners' position, however, is that their arguments regarding the two theories in question treat them as being interrelated in ways that we do not think they are.

For example, petitioners argue that, rather than applying "general principles of nonconforming use law," LUBA should have treated section 2028(B) as controlling on the *nonconforming use issue,* and should have deferred to the county's interpretation of that local provision pursuant to ORS 197.829(1)(a)-(c) and *Clark.* Beginning with that premise, petitioners develop a complex defense of the county's decision allowing the expansion of the nonconforming use, in which section 2028 and "traditional" nonconforming use concepts are intertwined. The essence of petitioners' argument is that, (1) regardless of any diminutions in the use that may have occurred between 1952 and 1990, the commercial-level kennel use was "resumed" under section 2028(B) through the two 1990 decisions; and (2) whatever the requirements of "general" nonconforming use law may be regarding continuity and extent as prerequisites to an alteration or expansion of a nonconforming use, section 2028 contains no similar requirements. Accordingly, petitioners conclude, LUBA was

---

[5] .n its present posture, this case *directly* involves only the asserted inconsistenc· ·of the rules with ORS 215.283(2) generally and with paragraph (m) of that subs. .tion specifically. We neither hold nor imply a view about whether LCDC's high ·alue farmland rules are subject to ORS 215.283(1). *Compare Brentmar v. Jac· ·on County,* 321 Or 481, 900 P2d 1030 (1995); *but see Nichols v. Clackamas Cou    /,* 146 Or App 25, 34, 932 P2d 1185 (1997).

wrong in holding that further definition of the extent of the original and continuing nonconforming use was a necessary precursor to the consideration or allowance of its expansion.

Petitioners rely on *deBardelaben v. Tillamook County*, 142 Or App 319, 922 P2d 683 (1996), where we held that LUBA erred in basing its reversal of a county decision allowing a variance on general principles of variance law rather than examining the county's interpretation of the specific variance provisions in its own ordinance and applying the deferential *Clark* review standard to that interpretation. After quoting the pertinent language in *deBardelaben*, petitioners assert:

> "Simply exchange the word[s] 'nonconforming uses' for the word 'variance' in the above quote from the *deBardelaben* decision, and one sees LUBA's error in this case. LUBA remanded the county's approval of an expansion of the Schillereffs' nonconforming kennel operation for fact finding as to the 'nature and extent' of the dog kennel use over the years since its beginning in 1952. This notion is central to traditional nonconforming use law *but has nothing to do with MCC 11.15.2028(B) or the resumption of the Schillereffs' nonconforming use.* * * * MCC 11.15.2028(B) establishes a less restrictive standard than traditional nonconforming use law." (Emphasis petitioners'; footnote omitted.)

Petitioners' attempt to analogize this case to *deBardelaben*, and their argument as a whole, fails for two reasons. First, in contrast to the variance provisions in *deBardelaben*, section 2028(B) does not and cannot be interpreted to say anything that either defines nonconforming uses or regulates them. Rather, the role of nonconforming uses in the section is simply that of a condition precedent to the operative provisions, *i.e.*, the "conversion" of preexisting nonconforming uses to conditional uses that, *after* their conversion, are subject to the conditional use regulations in the county's legislation. To the extent that the county has interpreted the section in the manner that petitioners assert, the interpretation cannot survive even under the less than stringent "clearly wrong" test that inheres in *Clark*. *See, e.g.,* *Goose Hollow Foothills League v. City of Portland*, 117 Or App 211, 217, 843 P2d 992 (1992) (explaining test). Far from

defining or regulating nonconforming uses, section 2028(B) provides that certain existing nonconforming uses are metamorphasized into a different kind of use to which the county's nonconforming use regulations do *not* apply.

■     Second, and also unlike the variances involved in *deBardelaben*, nonconforming uses are substantively regulated by a state statute, ORS 215.130. Although counties may adopt certain legislation that refines or amplifies the statutory provisions, *see Bither v. Baker Rock Crushing,* 249 Or 640, 438 P2d 988, 440 P2d 368 (1968), county legislation must be consistent with the state statute.

Moreover, because a state statute is involved, our scope of review of the present assignment of error differs from the one that applied to the previous assignment. ORS 197.829(1)(d) provides that a local government's interpretation of local land use legislation is reversible by LUBA, or implicitly by an appellate court reviewing LUBA's decision, if the interpretation is "contrary to a [state] statute, land use goal or rule that the [local legislation] implements." We have held that, in the case of the statewide goals or rules, the inquiry under ORS 197.829(1)(d) is limited to whether the local *interpretation* of the local provisions is inconsistent with the state provisions. *Friends of Neabeack Hill v. City of Philomath,* 139 Or App 39, 911 P2d 350, *rev den* 323 Or 136 (1996). However, because relevant state *statutes* retain their independent applicability to local land use decisions after the local legislation has been acknowledged under ORS 197.251, while generally speaking the statewide goals and rules do not, we have also held that local land use decisions as a whole, rather than only the interpretations of local legislation that the decisions may contain, are reviewable for *statutory* compliance in appeals from the decisions to LUBA and us even after the local land use legislation has been acknowledged. *Forster v. Polk County,* 115 Or App 475, 839 P2d 241 (1992), and authorities there cited; *see also Friends of Neabeack Hill,* 139 Or App at 46 n 3. Accordingly, even if section 2028(B) *were* pertinent to the nonconforming use expansion issue by its terms, neither the local provision itself nor the county's interpretation of it could provide a basis for affirming the county's decision if the decision is contrary to ORS 215.130.

■    For largely the reasons expressed by LUBA, we conclude that the county's present decision on the nonconforming use issue does not satisfy ORS 215.130. Without further findings by the county to particularize the nature and extent of the original and continuing nonconforming use, in the face of evidence that the use has historically receded from commercial to fairly minimal levels, the requested expansion cannot be justified under ORS 215.130(5) and (9). Subsection (5) provides that an "[a]lteration of any such [nonconforming] use may be permitted to reasonably continue the use." Subsection (9) defines "alteration" to include a "change in use of no greater adverse impact to the neighborhood." Whether the requested expansion meets that statutory standard cannot be ascertained unless the actual past and present scope of the use is identified and can be compared with the extent and effects of the proposed enlarged future use. Moreover, it cannot be known what is necessary and, therefore, permissible to "*continue the use*" in the absence of a prior determination regarding the nature and scope of the *original and present* use that have acquired and retain nonconforming status. The statutory test cannot be applied or passed on the basis of the county's present unquantified finding that *some* kennel use has endured throughout the 40-year period.[6] We hold that LUBA was correct in remanding the county's allowance of the application to expand a nonconforming use.

In their remaining assignment, petitioners contend that LUBA erred by remanding the county's granting of the application to expand the 50-dog kennel that putatively exists as a conditional use under section 2028(B). As in the previous assignment, the principal question here is whether the county was correct in concluding that a validly recognizable underlying 50-dog use existed, upon which the requested expansion could be predicated. In this assignment,

---

[6] The additional facts that the county must find *may* also affect the sufficiency of the applicants' showing under ORS 215.130(7), as well as subsections (5) and (9). That question, too, is before the county on remand.

In the present posture of the case, we cannot now decide whether the findings the county has made, *if* supplemented by the required additional ones, could suffice to establish compliance with the statute. However, if we correctly understand petitioners to argue that the existing findings are sufficient to demonstrate compliance in themselves, we disagree with them.

however, the specific question is whether that use was a conditional use established pursuant to section 2028(B) rather than a nonconforming use.

Some of petitioners' arguments in this connection nevertheless resemble their previous arguments regarding the expansion of the nonconforming use, and share the premise that the nonconforming use and the section 2028(B) issues are interrelated in ways that are mutually supportive of petitioners' positions on the respective issues.[7] As we have indicated, we disagree with that premise. Indeed, to the extent there *is* a relationship, LUBA's and our remand on the nonconforming use issue, in itself, requires that the section 2028(B) issue also be remanded to the county: The establishment of a conditional use under section 2028(B) is dependent on the existence of the nonconforming use which the county's decision has not satisfactorily defined.

However, as described earlier, the basis for LUBA's remand on the section 2028(B) issue was different from and broader than the one noted in the preceding paragraph. ORS 215.296(1) permits counties to approve uses under ORS 215.283(2) "only where the local governing body or its designee finds that the use will not:

"(a)   Force a significant change in accepted farm or forest practices on surrounding lands devoted to farm or forest use; or

"(B)   Significantly increase the cost of accepted farm or forest practices on surrounding lands devoted to farm or forest use."

---

[7] Again, for example, petitioners contend that the earlier nonconforming commercial kennel use was "resumed" pursuant to section 2028(B) through the 1990 proceedings. If that were a correct understanding of those proceedings, it would be open to serious doubt whether the 1990 decisions, or section 2028(B) itself, are consistent with the limitations that ORS 215.130(7) places on the resumption of discontinued nonconforming uses. However, we again disagree with petitioners' reading of section 2028(B). The section cannot be understood as simultaneously establishing the conditional use and revitalizing the nonconforming use that is a condition precedent to the establishment of the conditional use. The 1990 decisions that petitioners say resumed the nonconforming use were made 10 years after the date on which the section requires a nonconforming or other "legally established" use to have existed in order for a conditional use to come into being. In any event, the section does not deal with the creation—or resumption—of nonconforming uses but requires their *antecedent* existence. Section 2028(B) is a savings clause of sorts, but it does not purport to revive the dead.

■   LUBA concluded that the county's decision violates that state statute by interpreting and applying section 2028(B) in a way that allows a use subject to ORS 215.283(2) to achieve permitted status without being tested against the standards that ORS 215.296(1) requires it to satisfy.[8] We agree with LUBA, and we reject petitioners' arguments that challenge LUBA's reasoning directly.

However, petitioners also appear to contend that the county's 1990 design review for the 50-dog facility and its permit for the watchman's residence were based on section 2028(B). Although petitioners understand the 1990 decisions to have interpreted and applied the section in essentially the same way that the county's present decision does, petitioners assert that the earlier decisions are nevertheless independently relevant.

As a matter of *substance,* it is immaterial whether the county's impermissible application of section 2028(B) first occurred in 1990 or in 1995. ORS 215.296(1) existed in its present form at both times, and the way in which petitioners assert that section 2028(B) was applied in 1990 was as inconsistent with the requirements of the statute as the present decision was. Nevertheless, petitioners maintain that section 2028(B) was explicitly or implicitly interpreted by the local decisionmaker in 1990, and that a form of "issue preclusion" therefore bars its reconsideration now. Whether or not any such preclusive effect would have resulted if the section had in fact been interpreted as part of one or both of the 1990

---

[8] The terminology here can be confusing. Although section 2028(B) refers to "converted" former nonconforming uses as "conditional" ones, the section as the county interpreted it would confer that new status upon them without a conditional use permit requirement. Accordingly, the newly denominated "conditional" uses would *actually* be "permitted," whatever section 2028(B) may *call* them.

LUBA explained why there is a significant difference between that permitted status and the nonconforming status that the use ostensibly enjoyed before its "conversion" under section 2028(B):

"Permitted use status, as opposed to nonconforming use status, is not without legal [e]ffect. As a permitted use, the operation of a kennel could be altered or abandoned and resumed without addressing the nonconforming use limitations of ORS 215.130."

Although LUBA's observation is phrased subjunctively, it is far from an academic point. A case could be made that the combined success of the various arguments that petitioners make here would accomplish precisely what LUBA describes.

county decisions, we agree with LUBA that the county made no such interpretation. Petitioners base their contrary argument, *inter alia,* on the asserted fact that references to the section were made in the course of the 1990 county *proceedings.* However, they point to nothing in a 1990 *decision* that sets forth or suggests an interpretation of section 2028(B). We accordingly reject their issue preclusion argument.

We do not understand petitioners to argue that the 1990 decisions, or either of them, are preclusive or dispositive in any other way or for any other reason. Before LUBA, petitioners advanced an argument to the effect that the applicants had acquired a vested right to the 50-dog use through the 1990 decisions. Petitioners have chosen not to repeat that argument to us.

We have considered petitioners' other arguments and conclude that they do not require discussion.

Affirmed.